**UNITED STATES of America**

v.

**Albert W. COACHMAN.**

**Appeal of Wendell HILL (Material Witness).**

**UNITED STATES of America**

v.

**Albert W. COACHMAN.**

**Appeal of Gary BALLARD (Material Witness).**

**Nos. 81–2161, 81–2162.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 3, 1982.

Decided Jan. 18, 1985.

Theodore J. Christensen, Washington, D.C., appointed by the court, with whom William E. Reukauf, Washington, D.C., appointed by the court, was on the joint brief, for appellants.

Katherine Winfree, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, and John R. Fisher and Charles H. Roistacher, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROBINSON, Chief Judge, WALD, Circuit Judge, and SWYGERT *, Senior Circuit Judge.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON.

* Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant

**SPOTTSWOOD W. ROBINSON,** Chief Judge:

Appellants were twice held in criminal contempt, first when they refused to testify during a grand jury investigation, and again when they refused to testify at a trial emanating therefrom. Each appellant asserts that his successive refusals constituted but a single offense, and resultantly that his second contempt conviction offended the Double Jeopardy Clause of the Fifth Amendment. We disagree, and affirm the convictions.

**I**

Appellants were separately indicted on multiple counts of mail fraud,[1] theft of government property,[2] and making false claims against the Government.[3] These charges stemmed from a fraudulent scheme in which one Albert Coachman was suspected as a principal.[4] A plea bargain was struck, by the terms of which appellants would plead guilty to one count of making false claims, and the Government would dismiss the remaining counts at the time of sentencing.

Appellants entered those pleas, and shortly thereafter the Government subpoenaed them as witnesses before a grand jury investigating the involvement of Coachman and others. Each appellant invoked his Fifth Amendment privilege against compulsory self-incrimination and refused to testify. Subsequently, the District Court sentenced appellants to imprisonment on the counts to which they had pleaded guilty,[5] and granted the Government's motion to dismiss the rest of the counts.

Somewhat later, appellants appeared pursuant to a second subpoena from the grand jury investigating Coachman. When they again declined to testify, the District Court ordered them to do so, reasoning that the constitutional privilege against self-incrimination was not available for the offenses to which they had pleaded guilty or those dismissed under the plea agreement.[6] When appellants still refused to testify, they were adjudged guilty of criminal contempt, and given six-month sentences to operate concurrently with those earlier imposed.

Appellants served the contempt sentences, the grand jury indicted Coachman, and the Government again subpoenaed appellants, this time to testify at Coachman's trial. Despite directions by the District Court to testify, appellants persisted in their refusals,[7] and again were held in criminal contempt. Each was sentenced to another six months in prison, to commence after completion of the terms imposed upon the false-claims convictions. These appeals follows.

**II**

The Double Jeopardy Clause declares that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."[8] Each appellant contends that his second contempt conviction dishonors that pledge because his refusals to testify—first before the grand jury and later at Coachman's trial—constituted "the same offence." Appellants argue that the grand jury's investigation and the trial were but parts of a single proceeding, and, on the basis of the Supreme Court's deci-

---

to 28 U.S.C. § 294(d)(1982).

**1.** See 18 U.S.C. § 1341 (1982).

**2.** See 18 U.S.C. § 641 (1982).

**3.** See 18 U.S.C. § 287 (1982).

**4.** See *United States v. Coachman,* 234 U.S.App. D.C. 194, 196–197, 727 F.2d 1293, 1295–1296 (1984).

**5.** Hill was sentenced to a two-year term, and Ballard to a five-year term.

**6.** See *United States v. Pardo,* 204 U.S.App.D.C. 263, 271, 636 F.2d 535, 543 (1980); *In re Liddy,* 165 U.S.App.D.C. 254, 260–261, 506 F.2d 1293, 1299–1300 (1974).

**7.** Coachman was ultimately convicted, *United States v. Coachman,* Crim. No. 81–00090 (D.D.C. 1981), and his conviction was upheld on appeal. *United States v. Coachman, supra* note 4.

**8.** U.S. Const. amend. V.

sion in *Yates v. United States*,[9] that once they carved out an "area of refusal" before the grand jury, they could not again be held in contempt for refusing to testify within that area at the subsequent trial.[10]

To be sure, *Yates* lends superficial support to appellants' theory. Yates, testifying in her own defense at a joint trial for conspiracy to violate the Smith Act,[11] declined on the first day of her cross-examination to answer four questions as to whether a codefendant and a non-defendant were members of the Communist Party, but did answer all other questions the Government put to her on that day. The District Court held her in civil contempt, and committed her to jail until such time as she might purge herself by answering.[12] On the third day of cross-examination, Yates refused to answer eleven questions as to Communist Party membership of nine other persons. After she was convicted and sentenced in the conspiracy case, the District Court found her guilty of eleven separate criminal contempts for the third-day refusals, and ordered her to serve a year in prison for each, these sentences to run concurrently upon expiration of the conspiracy sentence.[13]

The Supreme Court held, however, that Yates committed only one contempt by the eleven third-day refusals.[14] She had "carved out an area of refusal" on the first day [15] and, said the Court, while a witness cannot " 'pick and choose' " among questions, "it is equally clear that the prosecution cannot multiply contempts by repeated questioning on the same subject of inquiry within which a recalcitrant witness already has refused answers." [16] The Court adverted to the Second Circuit's decision in *United States v. Costello*,[17] which had held that a witness who flatly refused to answer *any* questions, and who firmly maintained that position in the face of repeated interrogation, was guilty of only a single contempt.[18] "The policy of the law," the Supreme Court declared, "must be to encourage testimony," [19] and "a witness willing to testify freely as to all areas of investigation but one, should not be subject to more numerous charges of contempt than a witness unwilling to give any testimony at all." [20]

9. 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957).

10. Joint Brief for Appellants at 5.

11. Ch. 439, 54 Stat. 670 (1940) (codified as amended at 18 U.S.C. § 2385 (1982)).

12. *Yates v. United States, supra* note 9, 355 U.S. at 68–69, 78 S.Ct. at 130, 2 L.Ed.2d at 99. Yates remained in jail until the end of the trial. Thereafter, the District Court held her in criminal contempt for her four first-day refusals to answer. Both the civil contempt order and the criminal contempt conviction were reversed on appeal. See *id.* at 69 n. 3, 78 S.Ct. at 130–131 n. 3, 2 L.Ed.2d at 99 n. 3.

13. *Id.* at 69–70, 78 S.Ct. at 131, 2 L.Ed.2d at 99–100.

14. *Id.* at 72–75, 78 S.Ct. at 132–134, 2 L.Ed.2d at 101–103.

15. *Id.* at 73, 78 S.Ct. at 133, 2 L.Ed.2d at 102.

16. *Id.,* 78 S.Ct. at 133, 2 L.Ed.2d at 101. On the first day, Yates based her refusals on the possibility that her answers might precipitate harassment or loss of employment. *Id.* at 68, 78 S.Ct. at 130, 2 L.Ed.2d at 99. On the third day, however, she did identify one party member who she thought could not be hurt thereby, but declined to identify others. *Id.* at 69, 78 S.Ct. at 131, 2 L.Ed.2d at 99. The Court felt that "[t]he slight modification on [the third day] of the area of refusal did not carry beyond the boundaries already established." *Id.* at 74, 78 S.Ct. at 133, 2 L.Ed.2d at 102.

17. 198 F.2d 200 (2d Cir.), *cert. denied,* 344 U.S. 874, 73 S.Ct. 166, 97 L.Ed. 677 (1952).

18. *Id.* at 204.

19. *Yates v. United States, supra* note 9, 355 U.S. at 73, 78 S.Ct. at 133, 2 L.Ed.2d at 102.

20. *Id.* at 73, 78 S.Ct. at 133, 2 L.Ed.2d at 102. Accord, *Baker v. Eisenstadt,* 456 F.2d 382, 390 (1st Cir.), *cert. denied,* 409 U.S. 846, 93 S.Ct. 118, 34 L.Ed.2d 87 (1972). Since Yates had argued that the multiple contempt convictions violated the Fifth Amendment's Due Process Clause, the Court rested its decision upon that provision rather than upon the Double Jeopardy Clause, but recognized that the latter might be implicated by the facts of the case. The Court stated that no double-jeopardy problem arose from the *civil contempt* incarceration for the first-day refusals and the subsequent criminal contempt conviction for the third-day refusals. *Yates v. United States, supra* note 9, 355 U.S. at 74, 78

Like Yates, appellants clearly "carved out an area of refusal" when the Government's attorney first asked them questions they did not wish to answer.[21] Also like Yates, appellants persisted in their refusals when the prosecutor later propounded questions within the same area. But while Yates' successive refusals occurred during a single cross-examination in the course of a single trial, appellants' refusals came first during a grand jury investigation and later during the trial of Coachman ensuing upon the grand jury's indictment. We turn to consider appellants' double-jeopardy claims in that context.

### III

Appellants argue that since a grand jury investigating a particular charge and a trial jury weighing that charge inquire into the same subject matter, their activities should be regarded as sectors of an "unbroken prosecution"[22] summoning an application of *Yates*. We think this proposition does not withstand close analysis.

One need look no further than the Fifth Amendment to see that a grand jury investigation is divorced from a trial resulting from the investigation. That Amendment prescribes that a non-military felony prosecution may be instituted only upon a presentment[23] or indictment of a grand jury.[24] The role of the grand jury is twofold. Since an indictment must be founded upon probable cause to believe both that a crime has been committed and that the accused committed it,[25] the grand jury "serves the 'dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal

S.Ct. at 133, 2 L.Ed.2d at 102, citing *Rex Trailer Co. v. United States*, 350 U.S. 148, 150, 76 S.Ct. 219, 221, 100 L.Ed. 149, 154 (1956) and *United States v. UMW*, 330 U.S. 258, 299, 67 S.Ct. 677, 698, 91 L.Ed. 884, 915 (1947). The Court also noted that the third-day criminal contempt conviction did not offend the Double Jeopardy Clause since the sentence for Yates' first-day refusals was reversed on appeal, see note 12 *supra*, and, moreover, since the third-day sentence was actually imposed prior to the conviction for the first-day refusals. *Yates v. United States, supra* note 9, 355 U.S. at 74 n. 9, 78 S.Ct. at 133 n. 9, 2 L.Ed.2d at 102 n. 9.

**21.** Indeed, appellants defined their "area of refusal" even more sharply than did Yates, see note 16 *supra*, for they refused to answer *any* questions concerning Coachman's involvement in the fraudulent scheme. In that respect, this case is just like *United States v. Costello, supra* note 17, which the Supreme Court approved in *Yates*, see notes 17–20 *supra* and accompanying text. Costello flatly refused to answer any questions put to him by a Senate investigating committee, and the Second Circuit concluded that "when the defendant made his position clear, the Committee could not multiply the contempt, and the punishment, by continuing to ask him questions each time eliciting the same answer: his refusal to give *any* testimony." 198 F.2d at 204 (emphasis in original).

**22.** Joint Brief for Appellants at 5.

**23.** While the Grand Jury Clause speaks of "a presentment or indictment of a Grand Jury," see note 24 *supra*, "presentments as a method of instituting prosecutions are obsolete, at least as concerns the Federal courts." Fed.R.Crim.P. 7 advisory committee note to 4 to subdiv. a. See also *Gaither v. United States*, 134 U.S.App.D.C. 154, 158 n. 1, 413 F.2d 1061, 1065 n. 1 (1969); Orfield, *The Federal Grand Jury*, 22 F.R.D. 343, 437 (1958).

**24.** "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger...." U.S. Const. amend. V. An infamous crime is one that is punishable by death, or by imprisonment in a penitentiary or by imprisonment at hard labor. See *United States v. Moreland*, 258 U.S. 433, 42 S.Ct. 368, 66 L.Ed. 700 (1922); *Mackin v. United States*, 117 U.S. 348, 6 S.Ct. 777, 29 L.Ed. 909 (1886); *Ex parte Wilson*, 114 U.S. 417, 5 S.Ct. 935, 29 L.Ed. 89 (1885). Since the Attorney General may direct that any term of imprisonment above one year be served in a penitentiary, 18 U.S.C. §§ 4082, 4083 (1982), any offense punishable by imprisonment for more than one year is infamous. See Fed.R.Crim.P. 7(a), which embodies this understanding.

**25.** *United States v. Calandra*, 414 U.S. 338, 344, 94 S.Ct. 613, 618, 38 L.Ed.2d 561, 569 (1974); *Branzburg v. Hayes*, 408 U.S. 665, 687, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626, 643 (1972); *Ex parte Bain*, 121 U.S. 1, 11, 7 S.Ct. 781, 786–787, 30 L.Ed. 849, 853 (1887).

prosecutions.' "[26] The first function enables the grand jury to effectuate the second,[27] for the grand jury shields the accused from unjust prosecution by indicting only upon probable cause.[28]

If this were not its transcendent mission, the grand jury as we know it would be unnecessary.[29] Community members composing grand juries have no special skills making them any better able than governmental prosecutors to inquire into the existence of probable cause. But the one attribute which grand jurors do possess—and prosecutors lack—is that they are drawn randomly from a fair cross-section of the community.[30]

 The trial of an indictment serves a purpose different from that accomplished by a grand jury investigation. An indictment is simply an accusation; guilt or innocence of that accusation can be probed only

---

**26.** *United States v. Sells Eng'g,* 463 U.S. 418, ——, 103 S.Ct. 3133, 3137, 77 L.Ed.2d 743, 752 (1983), quoting *Branzburg v. Hayes, supra* note 25, 408 U.S. at 686–687, 92 S.Ct. at 2659, 33 L.Ed.2d at 643. See also *United States v. Calandra, supra* note 25, 414 U.S. at 343, 94 S.Ct. at 617, 38 L.Ed.2d at 568 (the grand jury's responsibilities "include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions"); *Ex parte Bain, supra* note 25, 121 U.S. at 11, 7 S.Ct. at 786, 30 L.Ed. at 852 (the grand jury "is designed as a means, not only of bringing to trial persons accused of public offences upon just grounds, but also as a means of protecting the citizen against unfounded accusation"); *In re Grand Jury January, 1969,* 315 F.Supp. 662, 671 (D.Md.1970) (the grand jury "is both a sword and a shield").

**27.** See *United States v. Cox,* 342 F.2d 167, 186 (5th Cir.) (Wisdom, J., concurring specially), *cert. denied,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965) ("[t]he Grand Jury earned its place in the Bill of Rights by its shield, not by its sword").

**28.** The idea that the grand jury serves a dual function is probably a vestige of its history. In early England, the government was highly centralized, and could not itself know the extent of crime throughout the realm or who was responsible for it. In order to meet this problem, the Crown established juries all over the country, composed of community members instructed to inform the Crown on crimes in the neighborhood, and thus to report on probable cause as we conceive it today. The grand jury gradually became independent of the Crown, and on this account eventually became valued as a protector of the innocent. See generally *United States v. Cox, supra* note 27, 342 F.2d at 186–187 (Wisdom, J., concurring specially). The Framers incorporated the grand jury institution into our Constitution to serve its protective function. *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397, 402 (1956).

**29.** We are aware of suggestions that although the Framers of the Constitution conceived the federal grand jury as an institution independent of the Executive Branch, in reality the grand jury is not independent at all. E.g., *In re Grand Jury Proceedings,* 486 F.2d 85, 90 (3d Cir.1973); Glanzer, Proceedings of the Thirty-Sixth Annual Judicial Conference of the District of Columbia Circuit, 67 F.R.D. 513, 538–539 (1975); Boudin, *The Federal Grand Jury,* 61 Geo.L.J. 1, 35 (1972). Despite this criticism, the Supreme Court has continually confirmed the vitality and importance of the grand jury. *United States v. Mandujano,* 425 U.S. 564, 571, 96 S.Ct. 1768, 1774, 48 L.Ed.2d 212, 219 (1976) (plurality opinion), (referring to "periodic criticism," stating that "much of [it] is superficial, overlooking relevant history," and declaring that "the grand jury continues to function as a barrier to reckless or unfounded charges"); *United States v. Sells Eng'g, supra* note 26, 463 U.S. at ——, 103 S.Ct. at 3141, 77 L.Ed.2d at 756; *United States v. Calandra, supra* note 25, 414 U.S. at 343, 94 S.Ct. at 617, 38 L.Ed.2d at 568; *United States v. Dionisio,* 410 U.S. 1, 16, 93 S.Ct. 764, 773, 35 L.Ed.2d 67, 81 (1973); *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569, 580 (1962); *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252, 257 (1960); *United States v. Johnson,* 319 U.S. 503, 510, 63 S.Ct. 1233, 1237, 87 L.Ed. 1546, 1553 (1943). We ourselves have done the same. *Nixon v. Sirica,* 159 U.S.App.D.C. 58, 70–71 n. 54, 487 F.2d 700, 711–713 n. 54 (*en banc* 1973). To disregard the role of the grand jury would be to effectively emasculate the Grand Jury Clause of the Constitution.

**30.** See 28 U.S.C. §§ 1861–1869 (1982). "The traditional English and American grand jury is composed of 12 to 23 members selected from the general citizenry of the locality where the alleged crime was committed. They bring into the grand jury room the experience, knowledge and viewpoint of all sections of the community. They have no axes to grind and are not charged personally with the administration of the law. No one of them is a prosecuting attorney or law-enforcement officer ferreting out crime." *In re Groban,* 352 U.S. 330, 346–347, 77 S.Ct. 510, 520, 1 L.Ed.2d 376, 388–389 (1957) (dissenting opinion) (footnote omitted).

at trial.[31] A grand jury investigating a suspect and a court trying an accused thus engage in separate and dissimilar functions. Indeed, when felony is the charge, a grand jury must complete its investigation and return an indictment before the fact-finding process of a trial ever begins.[32] Nonetheless, grand juries exploring crime and courts trying indictments have an equal need for witnesses to assist the discharge of their respective responsibilities; the "fundamental maxim that the public ... has a right to every man's evidence" [33] applies as much to the one as to the other.[34]

■ Contumacy before either a grand jury investigating or a court trying a charge obstructs that body's workings, and is punishable as a criminal contempt.[35] We think a witness contumacious before both bodies commits two contempts. We cannot believe that the "area of refusal" doctrine originating in *Costello* and adopted in *Yates* enables a witness to insulate himself from double contempt for all time. Surely, as it has been held, a witness refusing to testify at each of two trials can twice be adjudged in criminal contempt,[36] and we are unable to meaningfully differentiate

that situation from the one presented here. Each appellant impeded each of two distinct governmental functions—that of a grand jury investigating crime, and that of a court trying the resulting criminal charges. Recalcitrance of that sort is qualitatively dissimilar to that involved in *Yates* and *Costello*, where the testimonial refusal did not extend beyond a single trial. A grand jury's exploratory activity and a court's adjudicatory process are separate operations serving different purposes in our system of law enforcement, each vulnerable to frustration by contumacious witnesses. We conclude that a witness contemptuous in both operations defies governmental authority in each of those separate manifestations, and is guilty of separate contempts.

In so doing, we promote a fundamental policy voiced in *Yates*. As we have mentioned, the *Yates* Court declared that "[t]he policy of the law must be to encourage testimony" and, by treating "a witness willing to testify freely as to all areas of investigation but one" no worse "than a witness unwilling to give any testimony at

**31.** See *United States v. Calandra, supra* note 25, 414 U.S. at 339, 94 S.Ct. at 620, 38 L.Ed.2d at 566; *Silverthorne v. United States*, 400 F.2d 627, 634 (9th Cir.1968); *In re Neff*, 206 F.2d 149, 152 (3d Cir.1953).

**32.** *Branzburg v. Hayes, supra* note 25, 408 U.S. at 687, 92 S.Ct. at 2659, 33 L.Ed.2d at 643 ("[g]rand jury proceedings are constitutionally mandated for the institution of federal criminal prosecutions for capital or other serious crimes"); *Stirone v. United States, supra* note 29, 361 U.S. at 215, 80 S.Ct. at 272, 4 L.Ed.2d at 256 ("the Fifth Amendment requires that prosecution be begun by indictment"); *Gaither v. United States, supra* note 23, 134 U.S.App.D.C. at 159, 413 F.2d at 1066 ("[t]he Fifth Amendment guarantees that prosecutions for serious crime may only be instituted by indictment").

**33.** 8 J. Wigmore, Evidence § 2192 at 70 (McNaughton rev. 1961).

**34.** "[I]t is essential that courts be able to compel the appearance and testimony of witnesses..... A grand jury subpoena must command the same respect." *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535–1536, 16 L.Ed.2d 622, 627 (1966) (citations omitted). See also

*United States v. Dionnisio, supra* note 29, 410 U.S. at 9–10, 93 S.Ct. at 769, 35 L.Ed.2d at 77 (grand jury); *Blackmer v. United States*, 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375, 383 (1932) (court); *Blair v. United States*, 250 U.S. 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979, 982–983 (1919) (grand jury and court).

**35.** E.g., *United States v. Wilson*, 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975) (court); *Harris v. United States*, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965) (grand jury). The procedural prerequisites to contempt adjudications differ between the two, however. See *United States v. Wilson, supra*, 421 U.S. at 314–318, 95 S.Ct. at 1805–1807, 44 L.Ed.2d at 192–194; *Harris v. United States, supra*, 382 U.S. at 164–166, 86 S.Ct. at 354–355, 15 L.Ed.2d at 242–243.

**36.** *In re Boyden*, 675 F.2d 643, 644 (5th Cir.1982) (three trials of common origin); *United States v. Smith*, 532 F.2d 158, 160–161 (10th Cir.1976) (original trial and retrial). See also *United States ex rel. Ushkowitz v. McCloskey*, 359 F.2d 788, 789 (2d Cir.1966) (three criminal contempt convictions for refusing "on three occasions separated from each other by appreciable periods of time" to testify before the same grand jury did not violate the Double Jeopardy Clause).

all," [37] the Court hoped to encourage witnesses to testify at least on those subjects they find unobjectionable.[38] Were we to rule that appellants each committed only one contempt, we hardly would further the policy of inducing testimony. On the contrary, we likely would discourage non-testifying grand jury witnesses from taking the stand at ensuing trials, for such a ruling would protect them from a second contempt.[39] A witness already in contempt for refusal to testify before the grand jury has no incentive to testify at trial if he knows that he could suffer no additional punishment. That is a result Yates compels us to avoid.[40]

■ We hold that appellants' second criminal contempt convictions do not offend the Double Jeopardy Clause. That provision protects an individual only from being punished twice for the same offense,[41] and separate contempts are punishable as separate offenses.[42] Appellants committed two different offenses—one during the grand jury investigation and another at Coachman's trial—and thereby became subject to punishment for each.

## IV

■ We close our discussion with a reminder. In Yates, the Supreme Court observed that "the more salutary procedure would appear to be that a court should first apply coercive remedies in an effort to persuade a party to obey its orders, and only make use of the more drastic criminal sanctions when the disobedience continues." [43] More recently, the Court, citing "the doctrine that a court must exercise '[t]he least possible power adequate to the end proposed,'" admonished that "the trial judge [is required to] first consider the feasibility of coercing testimony through the imposition of civil contempt. The judge should resort to criminal sanctions only after he determines, for good reason, that the civil remedy would be inappropriate." [44]

37. Yates v. United States, supra note 9, 355 U.S. at 73, 78 S.Ct. at 133, 2 L.Ed.2d at 102.

38. See text supra at notes 19–20.

39. See text supra at notes 17–20.

40. If Yates had held that the witness committed multiple contempts rather than one, the result likely would have been less testimony; witnesses, in reliance upon Costello, see text supra at notes 17–18, could decline to take the stand at all—either before the grand jury or at trial—and thus could shed the risk of an additional contempt conviction. Our holding that appellants committed two contempts rather than one could not result in less testimony; rather, it is well calculated to result in more.

41. See text supra at note 8.

42. Bullock v. United States, 265 F.2d 683, 695 (6th Cir.), cert. denied, 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959); United States v. Hawkins, 501 F.2d 1029, 1031 (9th Cir.), cert. denied, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974); United States v. Gebhard, 426 F.2d 965, 968 (9th Cir.1970). See also cases cited supra note 36.

43. Yates v. United States, supra note 9, 355 U.S. at 75, 78 S.Ct. at 134, 2 L.Ed.2d at 102. Civil and criminal contempt proceedings are distinguished by nature and purpose. When the objective is vindication of the court's authority by punishing the contemnor, the proceeding is criminal; when intended to coerce compliance with an order of the court, it is civil. Id. at 74, 78 S.Ct. at 133, 2 L.Ed.2d at 102. See also Penfield v. SEC, 330 U.S. 585, 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117, 1122–1123 (1947); United States v. UMW, supra note 20, 330 U.S. at 302–304, 67 S.Ct. at 700–701, 91 L.Ed. at 917–918. See generally 8B M. Eisenstein, J. Moore & M. Waxner, Moore's Federal Practice ¶ 42.02[2] (2d ed. 1984) (civil and criminal contempt distinguished); 3 C. Wright, Federal Practice and Procedure § 704 (2d ed. 1982) (same). As the Supreme Court has explained, "[w]here contempt consists of a refusal to obey a court order to testify at any stage in judicial proceedings, the witness may be confined until compliance.... The conditional nature of imprisonment—based entirely upon the contemnor's continued defiance—justifies holding civil contempt proceedings absent the safeguards of indictment and jury, ... provided that the usual due process requirements are met." Shillitani v. United States, supra note 34, 384 U.S. at 370–371, 86 S.Ct. at 1535–1536, 16 L.Ed.2d at 627 (citation and footnote omitted).

44. Shillitani v. United States, supra note 34, 384 U.S. at 371 & n. 9, 86 S.Ct. at 1536 & n. 9, 16 L.Ed.2d at 628 & n. 9, quoting Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242, 248 (1821); In re Michael, 326 U.S. 224, 227, 66 S.Ct. 78, 79, 90 L.Ed. 30, 32 (1945). Accord, United States v. Wilson, supra note 35, 421 U.S. at 319, 95 S.Ct. at 1808, 44 L.Ed.2d at 194;

■ Ofttimes, the policy of testimonial encouragement will be fostered by first resort to civil contempt and later imposition of a criminal sentence, if at all, after termination of the proceeding in which the witness' testimony is desired.[45] The Double Jeopardy Clause will not become implicated by a criminal contempt conviction preceded only by a civil contempt order.[46] There is, too, another reason for seriously considering that course. A witness remaining wholly or partly silent before a grand jury might be called as a trial witness, not out of any sincere desire for his testimony but solely with a view to precipitating another contempt.[47] Nothing we decide today is intended to leave that sort of opening for

pure retribution.[48] A trial court possesses broad authority to determine whether it should hold a witness in criminal contempt, and it need not follow the prosecutor's lead.[49] Perhaps the best way of dealing with both the recalcitrant witness and the overzealous prosecutor is the use of civil contempt at the grand jury stage, and again even at the trial stage, and postponement of any criminal contempt conviction deemed essential until all need for the witness' testimony has ended.[50] In this fashion, the court can avoid both the possibility and the appearance [51] of pyramidal punishment.

In the cases at bar, the District Court did consider civil contempt at the grand jury

*Harris v. United States, supra* note 35, 382 U.S. at 165, 86 S.Ct. at 354, 15 L.Ed.2d at 242–243.

**45.** See *Yates v. United States, supra* note 9, 355 U.S. at 75, 78 S.Ct. at 134, 2 L.Ed.2d at 102. The suggestion that courts first resort to civil sanctions expectably will result in more testimony before grand juries than when criminal sanctions are imposed immediately. That is because the witness held in civil contempt may decide to testify rather than languish in jail. See note 43 *supra.* The witness held in criminal contempt, on the other hand, has no opportunity to purge himself of his contempt by testifying.

**46.** "[C]ivil and criminal sentences serve[ ] distinct purposes, the one coercive, the other punitive and deterrent; that the same act may give rise to these distinct sanctions presents no double jeopardy problem." *Yates v. United States, supra* note 9, 355 U.S. at 74, 78 S.Ct. at 133, 2 L.Ed.2d at 102, citing *Rex Trailer Co. v. United States, supra* note 20, 350 U.S. at 150, 76 S.Ct. at 221, 100 L.Ed. at 154; *United States v. UMW, supra* note 20, 330 U.S. at 299, 67 S.Ct. at 698, 91 L.Ed. at 915. Accord, *United States v. Morales,* 566 F.2d 402, 409 (2d Cir.1977); *In re Special September, 1972 Grand Jury (Lufman v. United States),* 500 F.2d 1283, 1285–1286 (7th Cir.1974); *United States v. Hawkins, supra* note 42, 501 F.2d at 1031.

**47.** See *In re Boyden, supra* note 36, 674 F.2d at 644.

**48.** A prosecutorial practice of this sort could conceivably implicate the witness' due process rights. See *North Carolina v. Pearce,* 395 U.S. 711, 725, 89 S.Ct. 2072, 2080, 23 L.Ed.2d 656, 669 (1968) (while not violating the Double Jeopardy Clause, "[d]ue process of law ... requires that vindictiveness against a defendant for having successfully attacked his first conviction

must play no part in the sentence he receives after a new trial").

**49.** See 18 U.S.C. § 401 (1982) (a federal court has "power to punish by fine or imprisonment, *at its discretion,*" contempts of its authority falling within three defined categories) (emphasis supplied); *Green v. United States,* 356 U.S. 165, 168–170, 78 S.Ct. 632, 635–636, 2 L.Ed.2d 672, 679–680 (1958); *In re Cuddy,* 131 U.S. 280, 285, 9 S.Ct. 703, 704, 33 L.Ed. 154, 156 (1889).

**50.** A civil contempt commitment cannot endure beyond this point. "No period of ... confinement [for failure to comply with an order of the court] shall exceed the life of ... the court proceeding ... before which such refusal to comply with the court order occurred ...," and in no event can the period exceed 18 months. 28 U.S.C. § 1826(a) (1982). See *Shillitani v. United States, supra* note 34, 384 U.S. at 371–372, 86 S.Ct. at 1536, 16 L.Ed.2d at 627–628 (civil contempt commitment for refusing to testify before grand jury expires at end of grand jury's term); *In re Dinnan,* 625 F.2d 1146, 1149–1150 (5th Cir.1980) (witness adjudged in civil contempt for refusing to testify at trial cannot be held in prison once trial has ended); *United States v. Powers,* 629 F.2d 619, 625–626 (9th Cir.1980) (same). Moreover, incarceration for civil contempt terminates when the party purges himself of the contempt by testifying. *Shillitani v. United States, supra* note 34, 384 U.S. at 370–372, 86 S.Ct. at 1535–1536, 16 L.Ed.2d at 627–628; *In re Dinnan, supra,* 625 F.2d at 1149–1150.

**51.** "[T]he *appearance* of justice is an independent value that must be maintained even in the absence of actual evidence that a particular litigant has been unfairly treated by the tribunal." Schwartz, *The Limits of Prosecutorial Vindictiveness,* 69 Iowa L.Rev. 127, 155 & n. 128 (1983) (emphasis in original).

level, but abandoned that approach in favor of criminal contempt.[52] Appellants were then in prison, as they were throughout Coachman's trial, serving the sentences imposed upon their guilty pleas to the false-claims charges.[53] Consequently, "the threat of immediate confinement for civil contempt would have provided little incentive for them to testify." [54] Absent that incentive, the public interest in obedience to lawful judicial commands could be vindicated only by punishment for criminal contempt.

The judgments appealed from are

*Affirmed.*

---

**52.** Appendix for Appellants 24–30.

**53.** See text *supra* at notes 5–7.

**54.** *United States v. Wilson, supra* note 35, 421 U.S. at 317 n. 9, 95 S.Ct. at 1807 n. 9, 44 L.Ed.2d at 193 n. 9 (parties already incarcerated when contemptuous acts occurred).